**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| SUE ANN MATTESON,<br><br>                Plaintiff,<br><br>        v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>              Defendant. | No. ED CV 04-1115-PLA<br><br>**MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

      Plaintiff filed this action on September 15, 2004, seeking review of the Commissioner's denial of her application for Supplemental Security Income payments. The parties filed a Consent to proceed before the undersigned Magistrate Judge on October 6, 2004.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on July 13, 2005, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

1

2

## II.

## __BACKGROUND__

3    Plaintiff was born on November 8, 1954. [Administrative Record ("AR") at 188.] Plaintiff has

4  three years of college education and past work experience as a janitor, machine operator, counter

5  clerk, fast food worker, office manager, "quality control person," and lab worker.  [AR at 29-31,

6  199, 232.]

7    On July 3, 2001, plaintiff protectively filed an application for Supplemental Security Income

8  payments, alleging that she has been unable to work since August 1, 1998, due to, among other

9  things, extreme pain, headaches, hepatitis C, arthritis, asthma, hiatal hernia, and acid reflux

10  disease.   [AR at 188-91, 231, 238-39.]   After her application was denied initially and on

11  reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").   A

12  hearing was held on March 6, 2003, at which plaintiff appeared with counsel and testified on her

13  own behalf. [AR at 26-36.]  A medical expert and vocational expert also testified. [AR at 36-46.]

14  On September 22, 2003, the ALJ determined that plaintiff was not disabled because she retained

15  the residual functional capacity[1] to perform sedentary[2] to light[3] level work activity with certain

16  postural, environmental, and manipulative limitations.  [AR at 10-23.] After the Appeals Council

17  denied review on August 6, 2004, the ALJ's decision became the final decision of the

18  Commissioner.  [AR at 4-7.]

19

20

21

22

23    [1]    Residual functional capacity ("RFC") is what a claimant can still do despite existing
exertional and nonexertional limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 5 (9th Cir.
24  1989).

25    [2]    Sedentary work is defined as work that involves "lifting no more than 10 pounds at a time
and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R.
26  §§ 404.1567(a), 416.967(a).

27    [3]    Light work is defined as work that involves "lifting no more than 20 pounds at a time with
frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b),
28  416.967(b).

2

III.

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257.  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner.  Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

IV.

**THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.     THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the

claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy.   The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ concluded that plaintiff has not engaged in any substantial work activity since the alleged onset of her disability.  [AR at 22.]  At step two, the ALJ concluded that plaintiff had the following medically determinable impairments: degenerative disc disease of the spine, knee pain, asthma, hepatitis C, chronic pancreatitis, and carpal tunnel syndrome in her right hand.  [AR at 22.]  At step three, the ALJ found that plaintiff's impairments do not meet or equal the requirements of any of the impairments in the Listings.  [Id.]  The ALJ determined that plaintiff retains the residual functional capacity to perform sedentary to light work with certain

postural, environmental, and manipulative restrictions.[4] [Id.]  At step four, the ALJ determined that plaintiff is unable to perform any of her past relevant work.  [Id.]  At step five, the ALJ concluded that based on plaintiff's age, educational background, past relevant work experience, residual functional capacity, and transferable skills, there are a significant number of jobs in the national economy that she can perform. [Id.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ: (1) improperly rejected the opinion of Elaine Gackle, MN, Family Nurse Practitioner (FNP-C); and (2) failed to appropriately consider the third party questionnaire completed by plaintiff's son, Michael Matteson.  Joint Stipulation ("Joint Stip.") at 2-7.  For the reasons discussed below, the Court respectfully disagrees with plaintiff, and affirms the Commissioner's decision.

**A.   THE ALJ PROPERLY CONSIDERED AND REJECTED THE OPINION OF NURSE GACKLE.**

Plaintiff argues that Nurse Gackle's medical opinion regarding plaintiff's work restrictions should have been given the same weight as a treating physician's opinion.  According to plaintiff, "[i]t is clear that Nurse Geckle [sic] is under the supervision of [treating physician] Dr. Pham and has to have his supervision and approval for her opinions and work product."  Joint Stip. at 3.  In support of her argument, plaintiff contends that the ALJ recognized Dr. Pham's involvement in formulating the February 25, 2003, "Medical Opinion Re: Ability to do Work-Related Activities

---

[4]    Specifically, the ALJ found that plaintiff has the capacity "to lift and carry 10 pounds frequently, 20 pounds occasionally, stand for 15 minutes at a time for a total of four hours in an eight hour day, and sit for a total of one hour at a time for a total of six hours in an eight hour day, with a sit/stand option." [AR at 22.]  The ALJ imposed postural limitations to include only occasional stooping and bending, and no crawling, and environmental limitations to include avoidance of moderate exposure to fumes, odors, dusts, gases, and poor ventilation, as well as avoiding all exposure to hazards such as heavy equipment.  The ALJ also imposed manipulative limitations to include only occasional gross manipulation, and no fine manipulation, with the right hand. [Id.]

1  "(Physical)" during the hearing, but then wrongly attributed that opinion to only Nurse Gackle in his

2  written opinion rejecting plaintiff's claim. [Id.]

3       The opinions at issue here are two physical assessments of plaintiff prepared by Nurse

4  Gackle.  In the first, completed on October 10, 2001, Nurse Gackle stated that plaintiff suffers from

5  oesteopenia of the lumbar spine and hands which causes significant restrictions in her functional

6  capabilities.  [AR at 342-44.]  Nurse Gackle indicated that plaintiff needs a cane or walker for

7  ambulation, and that plaintiff would be absent from work more than three times per month.[5]  [Id.]

8       On February 25, 2003, Nurse Gackle completed a second assessment where she again

9  indicated that plaintiff was severely restricted with respect to her physical capabilities.[6] [AR at 496-

10  98.]  In support of the limitations imposed, Nurse Gackle stated that plaintiff suffers from severe

11  asthma; arthritis, degenerative joint disease, and osteoporosis in her hands (pending a bone

12  density study); early carpal tunnel syndrome; moderate degenerative joint disease in the spine;

13  and two titanium pins/ligament grafting in her right knee secondary to an injury in 1998.  [AR at

14  ────────────────

15      [5]   In this assessment, entitled "Medical Opinion Re: Ability to Do Work-Related Activities
16  (Physical)," Nurse Gackle checked off that plaintiff could: (1) lift and carry less than 10 pounds on
   an occasional basis, and less then ten pounds on a frequent basis; (2) stand and walk less than
17  two hours during an eight hour day; and (3) sit for less than two hours during an eight hour day.
   [AR at 342.]  Nurse Gackle also checked off that plaintiff could only sit or stand for ten minute
18  intervals before changing her position to relieve discomfort, and that every fifteen minutes she
   must walk for ten minutes. [AR at 343.] According to Nurse Gackle, plaintiff needs to shift at will
19  from sitting or standing/walking, and needs to lie down at unpredictable intervals during the work
   shift. [Id.] Plaintiff is not allowed to twist, stoop/bend, crouch, climb stairs, or climb ladders. [Id.]
20  She must also avoid all exposure to extreme temperatures, wetness, humidity, noise,
   fumes/odors/gases/dust/poor ventilation, and hazards (i.e., machinery, heights). [AR at 344.]
21

22      [6]   In the second "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)," Nurse
   Gackle again checked off that plaintiff could: (1) lift and carry less than 10 pounds on an
23  occasional basis, and less then ten pounds on a frequent basis; (2) stand and walk less than two
   hours during an eight hour day; and (3) sit for less than two hours during an eight hour day.  [AR
24  at 496.] Plaintiff can only sit or stand for five minute intervals before changing her position to
   relieve discomfort, and every five minutes must walk for five minutes. [AR at 497.]  Plaintiff also
25  needs to shift at will from sitting or standing/walking, and needs to lie down at unpredictable
   intervals during the work shift. [Id.] Nurse Gackle indicated that she thought plaintiff would need
26  to lie down more than ten times a day. [Id.]  Plaintiff's ability to reach, handle, finger, feel, and
   push/pull is affected by hand pain and reduced range of motion. [AR at 498.]  Plaintiff must also
27  avoid  all  exposure  to  extreme  temperatures,  wetness,  humidity,  noise,
28  fumes/odors/gases/dust/poor ventilation, and hazards (i.e., machinery, heights).  [Id.]

497-98.] Nurse Gackle again found that plaintiff needs a cane to ambulate, and would be absent from work more than three times per month due to her impairments. [AR at 498.]

Plaintiff's argument that Nurse Gackle should have been considered as plaintiff's treating physician lacks merit. The ALJ properly rejected Nurse Gackle's opinion for the following specific reasons: (1) Nurse Gackle is not an "acceptable" medical source; (2) the objective medical evidence, including Nurse Gackle's own treatment records, does not support her opinion; and (3) plaintiff's condition showed some improvement when compliant with medication.[7]  [AR at 18.]

The Code of Federal Regulations categorizes medical opinions as coming from either "acceptable" or "other" sources. 20 C.F.R. §§ 404.1513(a),(d), 416.913(a),(d); see also Gomez v. Chater, 74 F.3d 967, 970 (9th Cir. 1996). "Acceptable" medical sources include physicians, psychologists, optometrists, podiatrists, and speech-language pathologists. 20 C.F.R. §§ 416.913(a)(1)-(5). "Other" sources include, for example, nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R. §§ 416.913(d)(1). The Commissioner is permitted to give medical opinions from "acceptable" sources more weight than those from "other" sources. Gomez, 74 F.3d at 970-71.

According to the Regulations, Nurse Gackle is considered an "other" source. 20 C.F.R. § 416.913(d)(1). To discount the testimony of an "other" medical source, the ALJ must set forth reasons germane to that witness. See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). A nurse practitioner who works "in conjunction" with a physician, however, constitutes an "acceptable" medical source. Gomez, 74 F.3d at 971.

Here, based on the evidence in the record, the ALJ properly characterized Nurse Gackle as an "other" source. To be considered as an "acceptable" medical source, Nurse Gackle needed to incorporate the opinion of plaintiff's treating physician, Dr. Pham, into the two physical assessments. See Gomez, 74 F.3d at 971. Contrary to plaintiff's argument, the evidence does

---

[7]   The ALJ also rejected Nurse Gackle's opinion on the basis that she was an advocate for plaintiff. The Court does not find conclusive evidence in the record indicating that Nurse Gackle was advocating on plaintiff's behalf. Because the other reasons cited by the ALJ for rejecting Nurse Gackle's opinions are sufficient, the Court does not address the advocacy issue in this opinion.

1    not support the finding that Nurse Gackle worked closely with and under the supervision of Dr.

2    Pham during the course of plaintiff's treatment.  The October 2001 opinion was only signed by

3    Nurse Gackle. [AR at 342-44.]  There is nothing in that assessment, or in the record as a whole,

4    indicating that Dr. Pham evaluated plaintiff and concurred in the determination of plaintiff's work

5    restrictions.  As for the February 2003 assessment, Dr. Pham's and Nurse Gackle's names are

6    stamped on the signature line alongside Nurse Gackle's signature.[8] [AR at 496-98.]  This,

7    however, is not proof that Dr. Pham participated in plaintiff's evaluation or had any input in the

8    determination of plaintiff's functional limitations.  See Davis v. Massanari, 2001 WL 34043759, *6

9    (D.Or. Aug. 15, 2001) (signature of treating doctor on documentation completed by nurse, without

10   evidence that the doctor had any contact with the plaintiff, did not elevate nurse's opinion to that

11   of an examining or treating physician).  Plaintiff has not pointed to any other evidence showing that

12   Nurse Gackle was working in conjunction with Dr. Pham when she rendered her opinions about

13   plaintiff's physical work capabilities.[9]  Accordingly, Nurse Gackle is considered an "other" source,

14   and her opinion is not entitled to controlling weight.  See Gomez, 74 F.3d at 970-71.  The ALJ was

15   therefore required to present reasons germane to Nurse Gackle to justify the rejection of her

16   opinion.  See Dodrill, 12 F.3d at 919.  For the reasons explained below, the ALJ met this

17   requirement.

18        First, the ALJ correctly noted that the objective medical evidence does not support Nurse

19   Gackle's restrictive determinations regarding plaintiff's functional limitations.  For example, Dr.

20   Concepcion Enriquez performed an internal medical consultation on October 12, 2001.  [AR at

21   259-65.]  The results of this exam show that plaintiff was able to generate thirty pounds of force

22

23        [8]   It appears to the Court that Dr. Pham's and Nurse Gackle's names are part of one single

24   stamp, and do not reflect separate, independent reviews by these individuals.

25        [9]   Plaintiff correctly points out that, in the hearing, the ALJ commented that the limitations set

26   forth in the February 2003 assessment were "noted by Dr. Fam [sic] or Miss Gackle." [AR at 45.]
     This brief reference to both Dr. Pham and Nurse Gackle, however, is not determinative. The ALJ's

27   opinion makes clear that he considers Nurse Gackle an "other" source, and as explained supra,
     the evidence fully supports this characterization.  In any event, even if Nurse Gackle were

28   considered as the equivalent of a treating physician, specific and legitimate reasons exist for
     discrediting her opinion.  See infra.

with both hands, and had normal range of motion in her cervical spine and upper and lower extremities.  Although plaintiff's lumbar spine exhibited tenderness and a decreased range of motion, the straight-leg-raising test was negative bilaterally.  Plaintiff's neurological exam returned normal results; she had normal muscle tone without atrophy and her senses were intact to pinprick and light touch.  Dr. Enriquez noted that plaintiff's gait and balance were normal, and no assistive device for ambulation was needed.[10]  Plaintiff's anterior neck, heart, and lungs were normal, but she exhibited tenderness in the right upper quadrant (where the doctor noted a cystic mass).  Dr. Enriquez noted that plaintiff had been diagnosed with carpal tunnel syndrome one month prior, and that x-rays show degenerative disc disease in the lumbar and thoracic regions of the spine. [AR at 261-64.]

In her evaluation, Dr. Enriquez found that plaintiff had no tenderness or limitation in range of motion of her shoulders, knees, elbows, hands and finger joints. [AR at 264.]  She was able to walk unassisted, and could do fine manipulation using her fingers with no difficulty, although she had osteopenia and degenerative joint disease bilaterally in her hands. [Id.]  Dr. Enriquez concluded that plaintiff was capable of the following: (1) lifting and/or carrying twenty pounds occasionally and ten pounds frequently; (2) standing and/or walking six hours total in an eight-hour day with normal breaks; (3) sitting for a total of six hours total in an eight-hour day with normal breaks; and (4) unlimited pushing and/or pulling (other than as shown for lifting and/or carrying). Dr. Enriquez found no other impairment-related limitations. [AR at 265.]  As described, these objective medical findings do not support the level of severity that Nurse Gackle suggested.

In addition, a functional capacity assessment was completed by a state agency consultant on November 2, 2001, which also controverts Nurse Gackle's assessments. [AR at 266-74.]  The results show that plaintiff had no postural, visual, or communicative limitations.  With respect to exertional limitations, plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours, sit for about six hours, and could perform unlimited

---

[10]   The Court notes that Dr. Enriquez's clinical determination that plaintiff needed no assistive device for ambulation came just two days after Nurse Gackle stated that plaintiff required a cane.

pushing/pulling.  As for manipulative limitations, plaintiff was restricted from frequent handling and/or fine manipulation due to early carpal tunnel in her right hand.  No manipulative restrictions were found for her left hand.  Due to her asthma, the following environmental limitations were indicated:  avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.  In making this assessment, the agency consultant noted that Nurse Gackle's opinion was too restrictive in light of the total medical evidence, and that the "degree of functional severity alleged is not fully supported by [the] objective medical evidence in [the] file." [AR at 271-72.]  On the other hand, according to the agency doctor, Dr. Enriquez's opinion was consistent with the other medical evidence.

The ALJ also observed that the treatment records from Arrowhead Regional Medical Center do not support the level of severity and functional limitations set forth in Nurse Gackle's opinion.  For example, in January 2001, Nurse Gackle's examination of plaintiff was unremarkable, and the only problem noted was tender sinuses. [AR at 422.]  In March 2001, plaintiff saw Nurse Gackle for hormone replacement therapy, and was in no acute distress. [AR at 419.]  Plaintiff had another normal physical exam in June of 2001. [AR at 400.]  Plaintiff tested positive for hepatitis C, but on July 24, 2001, her liver enzymes had improved. [AR at 393-94.]  On that date, although it was noted that plaintiff had degenerative joint disease of the thoracic and lumbar spine and osteopenia of the hands, her cervical spine x-rays were negative. [AR at 375-76.]  When plaintiff sought treatment on November 11, 2001, for abdominal pain, a review of her systems returned mostly normal results, and an axial CT of her abdomen and pelvis revealed no significant abnormalities. [AR at 331-33.]  In December 2001, when plaintiff was treated following her hospitalization for pancreatitis the month earlier, Dr. Pham observed that plaintiff's abdomen was soft, nondistended, and nontender to palpation. [AR at 297-304.]

On February 19, 2002, Dr. Pham treated plaintiff for her complaints of vomiting and abdominal pain.  On that date, Dr. Pham assessed plaintiff as alert and oriented, in no acute distress, and her lungs were clear to auscultation bilaterally. [AR at 480.]  The ALJ noted that plaintiff was conservatively treated for her medical complaints with Prevacid and Albuteral. [AR at 19.]  On March 7, 2002, plaintiff was treated for degenerative joint disease with osteopenia in

10

her hands. [AR at 472.]   The ALJ observed that the related clinical notes reflect that plaintiff's symptoms seemed to have increased after she stopped taking Celebrex and calcium, and that she again was conservatively treated to control her symptoms. [AR at 19, 472.]

Plaintiff was treated by Nurse Gackle on April 16, 2002, and complained of depression. [AR at 466.] The ALJ noted that she was not given a mental status exam or a referral to a psychiatrist, but continued with her conservative treatment (i.e., Fosamax, Celebrex, and Prozac). [AR at 19.] On July 16, 2002, Nurse Gackle determined that plaintiff could return to work with no restrictions. [AR at 451.]   In August 2002, plaintiff sought treatment for pain and requested a referral for physical therapy.  [AR at 443.]  The ALJ noted that, on that date, plaintiff communicated that physical therapy "helps a great deal with her pain." [Id.]

Although plaintiff was diagnosed with degenerative joint disease and osteopenia, and sought treatment on numerous occasions for  pain, the ALJ correctly observed that nothing in the record indicates the necessity for plaintiff to use an assistive device when ambulating.  As plaintiff was never prescribed a cane or walker, and her treatment notes do not reflect any gait abnormalities, Nurse Gackle's opinion that plaintiff needed a cane for ambulation has no support in the record.  The ALJ also pointed out that, despite plaintiff's allegations of pain and other symptoms, her prescriptions reflect a rather conservative course of treatment.  See Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (conservative medical treatment could suggest lower level of pain and functional limitation).  Overall, the objective medical evidence does not support Nurse Gackle's opinion that plaintiff would be absent from work more than three times per month, and was severely limited with respect to her physical capabilities.

Another reason noted by the ALJ in rejecting Nurse Gackle's opinion is the fact that plaintiff's symptoms have shown improvement with treatment.  For example, plaintiff reported to Dr. Enriquez that her pain is relieved by changing positions and by taking pain medication. [AR at 260.]  Additionally, the clinical notes indicate that, after plaintiff was hospitalized in November 2001 for pancreatitis, her condition improved with treatment, and plaintiff's abdomen was observed as nondistended and nontender to palpation. [AR at 297-304.]  Plaintiff also informed Nurse Gackle that physical therapy reduced her pain symptoms. [AR at 443.] The ALJ noted that when

1  plaintiff stopped taking Celebrex and calcium, it appears that her symptoms increased. [AR at
2  472.]  Furthermore, in July 2002, Nurse Gackle opined that plaintiff could return to work with no
3  restrictions -- which not only reflects that plaintiff's symptoms had improved substantially, but also
4  directly contradicts Nurse Gackle's prior October 2001 assessment that plaintiff was unable to
5  work.  [AR at 451.] There is no explanation in any of Nurse Gackle's treatment records regarding
6  this discrepancy.

7      Based on these specific reasons germane to Nurse Gackle, the ALJ properly rejected the
8  nurse's opinion.  Plaintiff has failed to establish that Nurse Gackle's opinion is supported by any
9  clinical findings, or that her opinion is entitled to controlling weight.  Alternatively, assuming
10 *arguendo* that Nurse Gackle's medical opinion could be elevated to the level of an "acceptable"
11 medical source, and therefore evaluated as the equivalent of a treating physician, certain reasons
12 stated by the ALJ for rejecting Nurse Gackle as an "other" source also constitute specific and
13 legitimate reasons that justify the rejection of her opinion as a treating source.

14     "[A]n ALJ need not give controlling weight to the opinion of a treating physician."  Batson
15 v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194-95 (9th Cir. 2004).  "The treating physician's
16 opinion is not ... necessarily conclusive as to ... the ultimate issue of disability."  Magallanes v.
17 Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted).  For example, the ALJ is not bound
18 to accept a treating physician's opinion that is brief, conclusory, and not supported by clinical
19 findings, especially when the opinion is in the form of a check-off report.  Id.

20     "The ALJ may disregard the treating physician's opinion whether or not that opinion is
21 contradicted." Batson, 359 F.3d at 1159 (quoting Magallanes, 881 F.2d at 751).  Where the record
22 contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving
23 the conflict.  Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  When the treating
24 physician's opinion is not uncontroverted, the ALJ may reject it by setting forth specific and
25 legitimate reasons for doing so which are based on substantial evidence in the record.  Smolen
26 v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

27     Here, as explained supra, the results of Nurse Gackle's two physical assessments were
28 controverted by the other objective medical findings, including the opinion of examining physician

12

Dr. Enriquez.  Accordingly, assuming plaintiff could establish that Nurse Gackle was a treating physician, the ALJ needed to provide specific and legitimate reasons supported by substantial evidence to properly reject her opinion.  For the reasons explained below, the ALJ met this requirement.

First, as discussed above, the ALJ determined that the objective medical evidence did not support the "degree of functional severity opined by Nurse Gackle." [AR at 18.] Neither Dr. Enriquez's examination results, the state agency consultant's opinion, nor the treating records substantiate Nurse Gackle's overly restrictive opinion.  Indeed, the record contains no physical test results or other objective findings by Nurse Gackle or Dr. Pham that support Nurse Gackle's opinion regarding plaintiff's physical capabilities.  The ALJ was therefore permitted to give greater weight to the clinical findings, such as Dr. Enriquez's examination results, which are supported by objective clinical tests, as opposed to Nurse Gackle's unsupported opinion.  See Magallanes, 881 F.2d at 751 (when an opinion of a non-treating physician is based on objective clinical tests that differ from the treating physician's findings, the non-treating opinion may serve as substantial evidence justifying the rejection of the treating physician's opinion).

Second, and also set forth above, the ALJ provided the specific and legitimate reason that plaintiff's condition showed improvement over time, and was to an extent controlled with medication. [AR at 18.] For example, the record reflects that plaintiff's pain was relieved by changing positions, physical therapy, and medications.  Moreover, Nurse Gackle herself opined that plaintiff could work with no restrictions in July 2002, even though plaintiff continued to seek treatment for her symptoms and had already been declared by Nurse Gackle in October 2001 to be severely incapacitated.  As such, there is substantial medical evidence in the record supporting the ALJ's contention that plaintiff's symptoms were not disabling.

Although not expressly mentioned by the ALJ, the Court notes that the physical assessments at issue, consisting of two check-off reports, were too conclusory to be highly probative.  Because Nurse Gackle did not elaborate on, or otherwise explain, how plaintiff's physical impairments resulted in the functional limitations set forth on the forms, the ALJ could have rejected her opinions on that basis alone.  See Magallanes, 881 F.2d at 751; Johnson, 60

F.3d at 1432 (the ALJ need not accept a treating physician's opinion which is "conclusory and unsubstantiated by relevant medical documentation"); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) (ALJ may reject the conclusory opinion of an examining or treating physician if the opinion is unsupported by clinical findings); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ properly rejected doctor's opinion because they were check-off reports that did not contain any explanation of the bases of their conclusions); Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions over check-off reports).

As shown, whether Nurse Gackle is considered as an "other" source, or as the equivalent of a treating doctor, specific and legitimate reasons based on substantial evidence in the record support the ALJ's rejection of her opinion.  The Court concludes that reversal or remand on this issue is not warranted.

**B.     THE ALJ'S FAILURE TO MENTION THIRD PARTY INFORMATION WAS HARMLESS.**

Plaintiff next argues that the ALJ erred by failing to mention the third-party questionnaire completed by plaintiff's son, Michael Matteson.[11]  [See AR at 215-17.]  In the questionnaire, the son indicated that he completed the form "[a]s told by my mom to me and seen by me." [AR at 215.]  According to plaintiff, the following written remarks by Mr. Matteson regarding plaintiff's social functioning were probative: (1) when asked about plaintiff's ability to attend movies, concerts or other entertainment activities, Mr. Matteson responded that she does not go because she "can't sit long enough or afford it;" (2) when asked about plaintiff's concentration and memory he responded that it was "not good;" (3) when asked if plaintiff's social activities have changed since her condition began, Mr. Matteson responded that she does not "go to activities as in church, mu[sic] event[s] etc. at all."  Joint Stip. at 6.

---

[11]   With respect to Issue No. 2, plaintiff does not specifically challenge the ALJ's findings that her mental impairment is not severe, or that her physical impairments do not render her disabled. Plaintiff only contests the ALJ's failure to consider the third party questionnaire.  The Court thus limits its discussion to this issue.

As stated in 20 C.F.R. §§ 404.1513(d) and 416.913(d), judges may "use evidence from other sources to show the severity of [plaintiff's] impairment(s) and how it affects [her] ability to work."  Such other sources include spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy. 20 C.F.R. §§ 404.1513(d)(4),  416.913(d)(4). Thus, lay witness testimony by friends and family members who have the opportunity to observe a claimant on a daily basis "constitutes qualified evidence" that the ALJ must consider. Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987); see Dodrill, 12 F.3d at 919 ("[a]n eyewitness can often tell whether someone is suffering or merely malingering.... [T]his is particularly true of witnesses who view the claimant on a daily basis..."). An ALJ's consideration of lay testimony becomes especially important when a plaintiff alleges "that pain is a significant factor of his alleged inability to work and the allegation is not supported by objective medical evidence in the file." SSR[12] 88-13; see Smolen, 80 F.3d at 1288. To reject lay testimony, an ALJ must give reasons "germane to each witness" for doing so. See Dodrill, 12 F.3d at 919.

The ALJ, however, "does not need to meet the impossible burden of mentioning every piece of evidence" presented to him. Parks v. Sullivan, 766 F.Supp. 627, 635 (N.D. Ill. 1991). As long as substantial evidence supports the ALJ's conclusion and the ALJ explains why significant probative evidence has been rejected, an ALJ's failure to discuss lay witness testimony constitutes harmless error. Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984). In Vincent, although the ALJ did not discuss the plaintiff's son's testimony in his hearing decision, the court held that such an omission did not require reversal because the medical evidence supported the ALJ's decision that the plaintiff was not disabled. Id.

The view that an ALJ need not discuss every piece of evidence, even when that evidence is from a lay witness, has found support in the Seventh and Eighth Circuits, especially when lay witness testimony does little more than corroborate a plaintiff's own testimony.  In Books v. Chater,

---

[12]    Social Security Rulings ("SSR") do not have the force of law.  Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

a Seventh Circuit decision, the court held that "[a]ll we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that [he] considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning.'" Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996) (quoting Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (quoting Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985)). Since plaintiff's brother's testimony in Books "did not constitute a separate 'line of evidence,'" but "served strictly to reiterate, and thereby corroborate, [plaintiff's] own testimony concerning his activities and limitations" -- and the plaintiff's testimony was found by the ALJ to be "untenable" when contrasted with his daily activities and the medical evidence -- the court held that the ALJ's failure to specifically discuss the plaintiff's brother's testimony was not error. Books, 91 F.3d at 980. Similarly, in Young v. Apfel, the Eighth Circuit held that "[a]lthough specific articulation of credibility findings is preferable, we consider the lack thereof to constitute a deficiency in opinion-writing that does not require reversal" as long as the ALJ's "ultimate finding is supported by substantial evidence in the record." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). In Young, since the same evidence the ALJ used to discount the plaintiff's testimony "also support[ed] discounting the testimony of [the plaintiff's] husband," the court held that "the ALJ's failure to give specific reasons for disregarding [the husband's] testimony [was] inconsequential." Id.

Any error by the ALJ in this case by not discussing Mr. Matteson's third party questionnaire was harmless. In the preceding section, the Court reviewed the clinical findings with respect to plaintiff's physical impairments, and concluded that the ALJ properly assessed plaintiff's physical capabilities based upon substantial evidence in the record. As set forth below, substantial evidence also supports the ALJ's conclusion that plaintiff was not severely mentally impaired. To the extent Mr. Matteson's remarks can be interpreted as evidence of either physical or mental disability, they conflict with the available medical evidence and are properly discounted.

With respect to the determination that plaintiff lacks a severe mental impairment, the ALJ relied upon the consultative psychiatric evaluation conducted by Ernest Bagner III, M.D. [AR at 20, 254-58.] Although plaintiff complained to Dr. Bagner that she had difficulty with her memory and concentration, the results of Dr. Bagner's examination show that her memory, concentration,

1   and judgment were intact.  Dr. Bagner also found that plaintiff's speech was normal, and there

2   was no evidence of hallucinations or paranoid delusions. [AR at 256.] He found that plaintiff would

3   most likely be able to interact with a supervisor, carry out simple three-part commands, carry out

4   repetitive tasks, handle a moderate degree of stress found in a typical work environment, work

5   with peers and the public, and attend work on a regular basis. [AR at 257.]   Dr. Bagner gave

6   plaintiff a Global Assessment of Functioning ("GAF") score score of 67,[13] and diagnosed her with

7   mood disorder (not otherwise specified).  [Id.]

8        Pursuant to these mild objective findings by Dr. Bagner, the ALJ determined that plaintiff

9   was not prevented from working for psychological reasons. [AR at 14.] In reaching this conclusion,

10  the ALJ found that the opinion of the state agency psychiatrist, who indicated that plaintiff would

11  have moderate difficulties in maintaining concentration, persistence, or pace, was unsupported

12  by the record. [AR at 19-20, 281-93.]  In particular, Dr. Bagner's nonsevere finding, coupled with

13  the fact that plaintiff never received treatment by a mental health professional, and was merely

14  prescribed Prozac by Nurse Gackle, showed that she was not severely impaired on account of her

15  mental status.  [AR at 20.]  Plaintiff has not proffered any countering clinical evidence supporting

16  her allegation of severe mental impairment. The Court therefore concludes that the ALJ's

17  determination regarding plaintiff's mental status was supported by the record.

18       The ALJ also considered plaintiff's subjective complaints, and found that her allegations of

19  mental impairment, pain, and "disabling exertional and non-exertional limitations" were not fully

20  credible. [AR at 13.] Because the ALJ's disbelief of plaintiff's subjective complaints was a critical

21  factor in the decision to deny benefits, the reasons discounting her subjective complaints must be

22  supported by explicit findings.  Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990); see

23

24  _____

25  [13]   A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is
    rated with respect only to psychological, social, and occupational functioning, without regard to
26  impairments in functioning due to physical or environmental limitations.  See American Psychiatric
    Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 2000).
27  A GAF score from 61-70 indicates mild symptoms or some difficulty in social, occupational, or
    school functioning.  An individual scoring in this range would generally function "pretty well" and
28  have some meaningful interpersonal relationships.  See DSM-IV, at 34.

17

Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (implicit finding that claimant was not credible is insufficient); see also Lester, 81 F.3d at 834 (the ALJ must provide clear and convincing reasons for discrediting a plaintiff's testimony as to severity of symptoms when there is medical evidence of an underlying impairment).  Indicia of unreliability upon which an ALJ may rely to reject plaintiff's subjective complaints include: (a) activities inconsistent with a finding of a severe impairment; (b) discrepancies in plaintiff's statements; (c) exaggerated complaints; and (d) an unexplained failure to seek treatment.  See Fair v. Bowen, 885 F.2d 597, 603-04 (9th Cir. 1989) ("if, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.").  If properly supported, the ALJ's credibility determination is entitled to "great deference."  Green v. Heckler, 803 F.2d 528, 532 (9th Cir. 1986).

Here, the ALJ's credibility determination is owed deference because it is based upon the following specific findings which plaintiff does not dispute.  [See AR at 20.]  First, despite plaintiff's allegations of severe depression, she never sought psychiatric treatment.  See Fair, 885 F.2d at 603. Second, contrary to plaintiff's allegations, Dr. Bagner opined that plaintiff was able to carry out simple three-part commands, and that her mental impairments were nonsevere and imposed only slight limitations.  Third, with respect to plaintiff's physical capabilities, Dr. Enriquez's examination revealed that plaintiff's gait and balance were normal, she could generate thirty pounds of force in both hands, and she could perform fine manipulation using her fingers with no difficulty.  Fourth, Dr. Enriquez and Dr. Grant-Anderson both opined that plaintiff did not require an assistive device to ambulate.  See 20 C.F.R. §§ 404.1529, 416.929 (permitting the evaluation of, among other things, inconsistencies in the evidence, and conflicts between a claimant's statements and the rest of the evidence, to determine the extent to which symptoms affect capacity to work).  Fifth, Dr. Grant-Anderson reviewed the medical evidence and determined that plaintiff could perform light work.  Sixth, plaintiff's asthma symptoms are controlled by medication, and there is no indication that her asthma renders her disabled.  Seventh, Dr. Enriquez's evaluation shows that plaintiff's back and neck pain are controlled by changing positions and

1  taking medication.  Eighth, plaintiff testified that her medications help in providing relief of her
2  symptoms, and cause no disabling side-effects. [See AR at 32.]

3      The failure to discuss Mr. Matteson's third party questionnaire constitutes harmless error
4  because the information he provided was not probative to the ALJ's determination.  Rather, Mr.
5  Matteson's statements only serve to corroborate plaintiff's own allegations, and are inconsistent
6  with the objective medical evidence.  See Books, 91 F.3d at 980; Vincent, 739 F.2d at 1395.  For
7  example, to the extent Mr. Matteson's comment that plaintiff "can't sit long enough" to watch a
8  movie indicates either a lack of ability to concentrate, or an inability to sit for prolonged periods,
9  this information is merely cumulative to plaintiff's testimony regarding her alleged concentration
10  problems and pain. [AR at 34-45.]  As explained above, Dr. Bagner's test results show that
11  plaintiff's concentration is intact.  Moreover, the ALJ took into account plaintiff's limitations by
12  restricting her to sitting for one hour intervals for a total of six hours with a sit/stand option. [AR at
13  22.]  Plaintiff has failed to establish how Mr. Matteson's statement regarding plaintiff's inability to
14  sit through a movie is inconsistent with this restriction, or how it constitutes conclusive evidence
15  that she is unable to work.

16      Next, Mr. Matteson's comment that plaintiff does not attend church activities or music
17  events is ambiguous as it is not clear whether he is attributing plaintiff's lack of participation to her
18  alleged mental impairments, or to her alleged physical symptoms.  Plaintiff does not explain in the
19  Joint Stipulation how this vague comment substantiates her claim that she is disabled and cannot
20  work.  In any event, as explained supra, the objective findings support the ALJ's determination that
21  plaintiff's mental condition is not severe. Moreover, aside from Nurse Gackle's two assessments,
22  which have been properly discredited, there are no other objective findings that support plaintiff's
23  allegations of disabling physical impairments.  Mr. Matteson's ambiguous remark is therefore not
24  probative on the issue of plaintiff's disability.  Finally, Mr. Matteson's statement that plaintiff's "short
25  term memory is not good" only serves to corroborate plaintiff's testimony that her "memory is
26  totally gone." [AR at 35.]  This allegation is directly contradicted by the results of Dr. Bagner's
27  examination which show that plaintiff's memory was not impaired.  [AR at 256-57.]

28

Because the medical evidence supports the ALJ's decision that plaintiff did not suffer from a severe mental impairment, or from disabling physical impairments, the fact that the ALJ did not discuss the questionnaire is harmless.  See Vincent, 739 F.2d at 1395.  The Court concludes that reversal or remand on this issue is not warranted.

## VI.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that: 1. plaintiff's request for reversal, or in the alternative, remand, is **denied**; and  2. the decision of the Commissioner is **affirmed**.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.


DATED: December 6, 2005                                      /S/
                                               PAUL L. ABRAMS
                                   UNITED STATES MAGISTRATE JUDGE